HENRY E. TRENDLEY; TAYLOR R. YOUNG and
HENRY A. GAUTIER, Appellants, v. ILLINOIS
TRACTION COMPANY, EAST ST. LOUIS &
SUBURBAN RAILWAY COMPANY, ELEC-
TRIC RAILWAY EXPRESS COMPANY, J. M.
ALLEN, FREDERICK E. ALLEN, C. H.
STARKEL, J. WEINGAERTNER and P. J.
JOHNSON.

In Banc, March 1, 1912.

1. **CONTRACT: Cancellation: Unwise.** If a contract made by a
corporation was made in good faith and by lawful authority
it cannot be set aside by the court at the suit of the minority
stockholders and minority directors on a showing that it was
unwise or that it gave to the other party the advantage. Cor-
porations, like individuals, make bad bargains, but the courts
will not for that reason set their contracts aside.

2. ————: ————: **Fraud.** An express company had a contract
with the Suburban Railway Company whereby the express com-
pany was granted the exclusive right to do an express business
over the lines that the railway company then owned or might
thereafter acquire, and that contract was at a subsequent date
so modified as to relinquish the exclusive feature of the con-
tract and to authorize the 'Suburban Company to make a con-
tract with the Illinois Traction Company allowing the latter
to pass its cars carrying through-express freight over certain
lines of the Suburban Company. It is this modification· of the
original contract that is the matter in suit, and the plaintiffs,
who are minority stockholders and minority directors of the
express company, claim that the modification was so unfavorable
to the express company as to sustain the allegation that it
was the result of fraud on the part of its president and other
directors entrusted with the duty of protecting the company.
The Traction Company owned a large system of completed
interurban electric railways coming from Springfield, Illinois,
to St. Louis, and when the contract was modified was con-
structing a line which if completed would reach from Edwards-
ville to East St. Louis and carry both local and through-
express freight, but it wished to cover the route by use of
the Suburban tracks, without building that line. If that
line were built the Traction Company would have hauled ex-
press freight, and would have been a more formidable com-
petitor of the express company from Edwardsville to East St.
Louis than it would have been if the concession to carry only

through freight over the Suburban were made, which concession the modification of the contract permitted to be made, and by that modification the express company relinquished its exclusive right to carry through-express freight between Edwardsville and East St. Louis over the Suburban, but acquired the right to run express cars between those two cities, and between Alton and East St. Louis. *Held*, that these facts show that the charge of fraud against the majority directors was unfounded.

3. ————: ————: **Reduction of Capital by Unwise Contract.** A board of directors cannot increase or reduce the capital stock of a corporation, but that rule does not prevent the directors from modifying a contract which constitutes a large per cent of the company's assets, even though it be ninety per cent, and the modification results in great loss to the company. Nor can the board of directors, unless authorized thereto by the stockholders, put an end to the company's business and defeat the objects of its creation by selling in mass all its property and good will; but where the modification of an existing contract had no such purpose, and the evidence tends to show that if the majority of the directors had been left alone to carry on its business under the modified contract, and had not been harassed by hurtful suits brought by the minority directors and stockholders, the corporation might have entered upon a successful business career, it will not be held that the board of directors did not have authority to make the modified contract.

4. ————: ————: **Special Meeting: Specified in Notice.** A notice specifying that the purpose of the special meeting of the board of directors would be to authorize the president to sign and enter into a certain contract "bearing date July 16, 1906," sufficiently specifies that the purpose was to execute a contract bearing that date, which after being redrafted and dated July 18th, but not otherwise changed, was then signed—especially where all the directors were present.

5. **CORPORATION: Directors: Lawful Meeting: Trapped Into Being Present.** A director cannot be trapped into a meeting of the board against his will; and though the meeting is held on the day and at the hour fixed by the by-laws, yet if his presence is necessary to make a majority and he took no part in the meeting, it was not legal. So that where the by-laws provided for a regular meeting at ten a. m. on the first Monday of each month, at the company's office, which was rarely observed, and at that hour on a certain first Monday two of the five directors called at the office where another was in charge and stated to him that they had come to hold a directors' meeting, and he left, though counted by them as present, and no notice had been given of such meeting to either him or

the other directors and no meeting was expected, said meeting was not legal.

6. CONTRACT: Cancellation: Equity: Forfeiture: Pleading: Decree. Where the petition to have cancelled a modification of a contract between an express company and a railway company, states that the contract has been forfeited by the railway company and asserting that it would be inequitable to permit it to be forfeited and praying that the forfeiture and modification be annulled and that the railway company be compelled to continue to perform the original contract, to which the railway company files a general denial, a dismissal of the bill and a refusal to cancel the modified contract completely disposes of the question of forfeiture; and it was not good pleading for defendant to justify the forfeiture in its answer by way of a cross-bill, in the equity suit, but since the dismissal of the bill disposes of the question of forfeiture, that part of the decree declaring the contracts forfeited may be ignored.

7. RECEIVERS: Distribution of Proceeds: No Objection · to Order Until After Appeal. Where plaintiffs did not object to the failure of the final decree discharging the receivers to order that they be reimbursed for money advanced to the corporation until after their motion for a new trial had been overruled and the appeal taken, they cannot on appeal object to the decree on that account. Where the receiver's report in all respects complies with the decree, and an appeal has been taken from that decree, any subsequent motions plaintiffs may file in the case are not for review and cannot be incorporated in the bill of exceptions. In such case the appeal is from the decree as it stands, and new matters subsequently brought into the case are not for consideration in determining whether appellants have been aggrieved by that decree.

Appeal from St. Louis City Circuit Court.—*Hon. M. G. Reynolds,* Judge.

Affirmed.

*Daniel Dillon* and *Taylor R. Young* for appellants.

(1) The contract of August 16, 1904, constituting, as it did, ninety per cent of the value of the assets of Electric Railway Express Company, and having been accepted as payment for that proportion of the capital stock of the company because of its exclusive feature,

could not be modified by the board of directors so as to eliminate this feature. In attempting to do so, the board of directors exceeded their power. Chicago Ry. Co. v. Allerton, 18 Wall. 233; Pressed Brick Co. v. Schoenrich, 65 Mo. App. 283; Gill v. Ballis, 72 Mo. 424; Library Hall Co. v. Pittsburg Library, 173 Pa. St. 30; Hope v. Beckman, 47 Mo. 93; Bank v. Johnson, 24 Me. 490; Bedford v. Bowser, 48 Pa. St. 29; Olleshemer v. Mfg. Co., 44 Mo. App. 172; 10 Cyc., p. 758 to 770; Kelsey v. Sargent, 40 Hun, 150; 2 Thompson on Corporations (2 Ed.), sec. 1187; Shoe Co. v. Kurtz, 34 Mich. 89; Cass v. Iron Co., 9 Fed. 640; Venner v. Railroad, 28 Fed. 581. This power rested in the stockholders solely. 3 Thompson on Corporations, sec. 3979; 1 Elliott on Railroads, sec. 254. (2) Even if the directors did have the power to so modify said contract, the execution of the contracts actually executed, dated July 18, 1906, August 10, 1906, and November 6, 1906, were never, prior to the institution of this suit, nor at any other time, authorized by the board of directors of the Electric Railway Company, since the minutes of the directors' meeting of July 31, 1906, are incorrect, and the officers of Electric Railway Express Company were only authorized to execute the contract read at said meeting, and which was never executed, and contains valuable features omitted in the contracts as actually executed. Campbell v. Pope, 96 Mo. 468. (3) But conceding this power as resting in the board of directors, and also conceding the minutes of the meeting of directors held on July 31, 1906, to be correct, yet the contracts of July 18, 1906, August 10, 1906, and November 6, 1906, were executed without authority for the following reasons: (a.) The modification of the contract of August 16, 1906, was a matter of discretion, which, if it did rest in the board of directors, and not the stockholders, could not be delegated to Mr. Allen, the president; 10 Cyc. 770; 3 Thompson on Corporations, sec. 3944; 1 Elliott on Railroads, sec. 257; State

ex rel. v. Perkins, 90 Mo. App. 603; Railroad v. Railroad, 51 Fed. 309; York Co. v. Ritche, 40 Me. 425.   (b.) Allen, having an interest in the execution of the contract of July 18, 1906, believing, as he did, that it would pay for his stock in Electric Railway Express Company, and having actually executed that contract, the same is voidable and may be set aside at the instance of the stockholders.  Engine Co. v. Charter, 47 Ill. App. 36.   (c.)  Prior to the execution of the said contracts of modification, a legal meeting of directors of Electric Railway Express was held on August 6, 1906, and the officers of the express company were directed not to execute said contracts of modification unless authorized so to do by a resolution of the stockholders at a duly called meeting (which was never done), and said contracts of modification were, at said director's meeting, expressly disapproved.  3 Clark & Marshall on Corporations, p. 2085 to 2087; Library Hall Co. v. Library Assn., 173 Pitt. 30; State v. Mayor, 37 Mo. 270; Buell v. Buckingham, 16 Iowa, 284; 2 Thompson on Corporations (2 Ed.), sec. 1156; Foster v. Mill Co., 92 Mo. 79; Field v. Field, 9 Wend. 394; Gas Co. v. Rushville, 6 L. R. A. 315; Stobo v. Prov. Co., 45 Ill. App. 440.  No notice need be given of the holding of a directors' meeting held on the regular meeting day as provided by its by-laws.   (d) No proper legal notice was given to the directors of the object and purpose of the meeting of July 31, 1906. The notice which was given amounts to nothing more than a request to meet. The nature of the contracts should have been given under the circumstances of this particular case.   Hill v. Mining Co., 119 Mo. 9; St. Louis v. Withaus, 90 Mo. 646; Clark & Marshall on Corporations, p. 2082; 2 Thompson on Corporations (2 Ed.), sec. 1140, 1141; Young v. South African Syndicate, 65 L. J. Ch. 638.   (e.)  Even if the notice would, under ordinary circumstances, be sufficient, yet it is invalidated absolutely by the false statement of President Allen on July 27, 1906, to direc-

tor Young, who, upon receipt of said notice, inquired of President Allen the nature of the proposed contracts, and was told that since the defendant East St. Louis & Suburban Railway Company had acquired the Alton, Granite & St. Louis Traction Company and Edwardsville line he thought it advisable to perfect the express company's rights to carry express over those lines by the execution of a formal contract by East St. Louis & Suburban Railway Company to that effect. Under such circumstances, it was no notice at all to Director Young. Johnston v. Jones, 23 N. J. Eq. 216. (f.) Even if the notice of the purpose of holding the meeting of July 31 be sufficient and though directors had the power to surrender the exclusive feature in the contract of August 16, 1904, and also had power to delegate this authority to J. M. Allen, yet the latter had no authority to delegate the authority thus delegated to him to a board of arbitration, which he did do, consisting of counsel for the Clark interests and Messrs. Warnock, Williamson & Burroughs. Madden v. Realty Co., 75 Mo. App. 358; Mechem on Agency, sec. 185-186-191; Morawetz on Corporations, sec. 536; Neiner v. Altemeyer, 68 Mo. App. 243. (g.) Though conceding the point raised in the last paragraph to be without merit Mr. Warnock was an incompetent arbitrator. No formal retainer is necessary to create the relation of attorney and client. Mechem on Agency, secs. 808, 822, 824, 798; Atlee v. Fink, 75 Mo. 100; Briggs v. Withey, 24 Mich. 136; Goldsmith v. Wamsganz, 86 Mo. App. 9; Stone v. Slattery, 71 Mo. App. 445; Tisdale v. Tisdale, 64 Am. Dec. 783. (h) But conceding all the foregoing points to be without merit, yet the contracts were entered into without authority, since J. M. Allen did not execute any contract which "in his judgment, would best subserve the interests of the company," for he did not exercise his judgment or discretion in determining such contract. Fred E. Allen, his brother, substituted his discretion for the

discretion of J. M. Allen, although the former knew nothing about the contract of August 16, 1904, and for and in behalf of Electric Railway Express Company agreed upon the terms of the contract of July 18, 1906, though F. E. Allen admits he acted for the interests of his own company—the East St. Louis & Suburban Company. Lee v. Smith, 84 Mo. 309; Atlee v. Fink, 75 Mo. 100. (4) There was no consideration given defendant Electric Railway Express Company for the contract of July 18, 1906, and it should be set aside on that ground. It amounts to a fraud in this case. Railroad v. Brown, 43 Mo. 294; Durfer v. Moran, 57 Mo. 374; Holdsworth v. Shannon, 113 Mo. 508; Lamp Co. v. Electric Co., 64 Mo. App. 115. Even if there was any consideration for the contract of July 18th, 1906, it was so grossly inadequate as to shock the conscience of a chancellor, and said contract, for that reason, should be set aside. Holmes v. Fresh, 9 Mo. 201; Nelson v. Betts, 21 Mo. App. 219. (5) But if all the points heretofore urged as a reason for setting aside the contracts of July 18, August 10 and November 6, 1906, should be without merit, yet these contracts should be set aside on the ground of the fraudulent conduct of the defendants. Even if the Illinois Traction Company was not a party to the actual fraud, it had notice of same since the contract of August 16, 1904, was a matter of record, the same having been duly recorded in the office of the recorder of deeds at Belleville, St. Clair county, Illinois, during the month of August, 1904, and notice of action of directors of Electric Railway Express Company, August 6, 1906, having been given it prior to execution of the contract giving it the right to operate over the Clark rails. 16 Cyc. 81 to 88; Harkness v. Fraser, 12 Fla. 341; Atlee v. Fink, 75 Mo. 100; Corder v. O'Neill, 207 Mo. 637; Tisor v. Labaume, 14 Mo. 198; Doss v. Davis, 60 Mo. 300; Dickson v. Kempinsky, 96 Mo. 252. (6) The court erred in overruling plaintiff's motion to set

aside its order in directing the receivers to deliver all property in their possession belonging to Electric Railway Express, and discharging the receivers, and in overruling plaintiffs' motion for an order on defendant J. M. Allen, as president of Electric Railway Express Company to turn over to said receiver the sum $4.200 derived from the proceeds of the sale of assets belonging to Electric Railway Express Company theretofore in possession of said receivers, the plaintiffs in this case having a first lien on these assets, and on the proceeds from the sale thereof by virtue of their ownership of the receivers' certificates issued by said receivers under order of court, and on which there remained an unpaid balance of $4000 and interest. Kneeland v. Luce, 141 U. S. 491; Alderson on Receivers, p. 468, sec. 340. It has been held that receivers' certificates are entitled to priority of payment over the receivers' fees, and compensation for his counsel. Bank v. Coal & Coke Co., 115 Fed. 878. Even though said motion was made and overruled after entry of final decree. St. Louis v. Brooks, 107 Mo. 380. (7) The trial court erred in enforcing the forfeiture as prayed by defendant East St. Louis & Suburban Railway Company, and in failing to relieve such forfeiture. Moberly v. Trenton, 181 Mo. 645; 2 Story, Eq. Jur. (13 Ed.), p. 652; Pomeroy, Eq. Jur. (2 Ed.), sec. 459; Messersmith v. Messersmith, 22 Mo. 369; Towne v. Bowers, 81 Mo. 491; Sease v. Cleaveland F. Co., 141 Mo. 488. In Giles v. Austin, 62 N. Y. 486, and Noyes v. Anderson, 124 N. Y. 175, it is held that a forfeiture will, in equity, always be relieved where the nonpayment is a mere omission, and not an act of wilful bad faith. Time was not of the essence of contract of August 16, 1904. Pomeroy v. Fullerton, 113 Mo. 440. But if it was it was waived. Esbell v. Railroad, 56 Mo. 282.

*N. S. Brown, Seddon & Holland,* and *Schaefer, Farmer & Kruger* for respondents.

VALLIANT, C. J.—This is a suit in equity wherein the plaintiffs are the minority stockholders and the minority directors, and the individual defendants are the majority stockholders and the majority directors of the defendant corporation the Electric Railway Express Company; the other defendants are the East St. Louis and Suburban Railway Company and the Illinois Traction Company, both of which are Illinois corporations. The object of the suit is to cancel certain contracts whereby a previous contract between the East St. Louis & Suburban Railway Company and another corporation called the Electric Express Company, of date August 16, 1904, which contract had been duly assigned by the Electric Express Company to the defendant the Electric Railway Express Company, was modified or changed in certain important particulars. The ground on which the plaintiffs seek to have the contracts of which they complain set aside is that they were the result of fraud and conspiracy on the part of the individual defendants assuming to represent the Express Company on the one hand, and the East St. Louis & Suburban Railway on the other.

The East St. Louis & Suburban Railway Company at the time referred to owned and operated certain lines of railroad which extended from East St. Louis east and southeast, over which lines cars were propelled by electricity. That railroad company, August 16, 1904, entered into a contract with a corporation called the Electric Express Company, whereby the latter company, in consideration of a certain per cent of its earnings to be paid to the railroad company, was granted the exclusive right to do an express business over the lines that that railroad company then owned or might thereafter acquire, and the railroad

241 Sup.—6

company was to furnish the Express Company cars for that business, and the Express Company was to furnish the railroad company an account of its earnings for each month on the 10th day of the month next following, and pay the rate per cent of its earnings agreed on to the railroad company on the 15th, and on failure to render the account and make the payment at the time specified the railroad company had the right to cancel the contract.

The petition alleges that the exclusive right to do an express business over the lines of the East St. Louis & Suburban Railroad Company (which we will hereinafter call the Suburban Company) was of great value and the chief asset of the Electric Railway Express Company which will hereinafter be called the Express Company). It is further alleged that the individual defendants as officers and directors of the Express Company "fraudulently and covinously" for their personal profit and to the injury of the Express Company, entered into "three pretended contracts" with the Suburban Company of dates respectfully July 18, August 10 and November 6, 1906, whereby the valuable right held by the Express Company under the contract of August 16, 1904, was attempted to be annulled.

At a special meeting of the board of directors of the Express Company, held July 31, 1906, defendant Allen presented to the board for its approval a paper then unsigned, dated July 16, 1906, in form of a proposed contract to be made between the Express Company and the Suburban Company, in which the Express Company was to agree, for the consideration therein expressed, to relinquish the exclusive feature of its contract of date August 16, 1904, and to authorize the Suburban Company to make a contract with the Illinois Traction Company allowing the latter to pass its cars carrying through-express freight over certain lines of the Suburban Company. A full board

was composed of five directors, but one director had resigned; the remaining four were present at that meeting; three of those present voted to approve the contract and to authorize its officers to execute it on the part of the Express Company; one director voted no on the proposition. Two days after the adjournment of the meeting, August 2, 1906, one of the directors who had voted to approve the contract and authorize its execution, notified Mr. Allen, the president of the Express Company, that he had examined the contract carefully and was then of the opinion that it was not for the best interest of the Express Company and requested that it be not executed and he also notified the officers of the Suburban Railway Company not to execute the contract. The petition also states that this director at the same time notified Mr. Allen, president of the Express Company, that he, the director, had been deceived by Mr. Allen and misled by false statements made by him into voting for the contract at the meeting, but there is no specification as to what the statements of Mr. Allen were that are alleged to be untrue, further than the general statement that he said it was for the best interest of the Express Company.

The contract of August 10, 1906, above mentioned, was an agreement between the Suburban Company, represented by its vice-president, and the Express Company, by its president, agreeing to submit the draft of the proposed contract of July 16th to their respective attorneys, to decide "whether it clearly expresses its intent," and the attorneys were to draft a new form if the one presented was not clear in its meaning, or draft a supplement thereto, interpreting any clause of uncertain meaning. Then came the above mentioned contract of November 6, 1906, drawn by those attorneys, in which it is recited that there were some uncertainties or ambiguities in the language of the draft of July 16th, and these were interpreted and

their meanings put at rest by that instrument. The two instruments, that of July 16th and November 6th, are but one contract, the latter explaining the first.

A charge is made in the petition that the attorney intrusted with the matter of interpreting the draft of the contract of July 16th on the part of the Express Company was really an attorney for the Suburban Company, but that charge went no farther in specification than asserting that he was employed by the Suburban Company to represent it in certain other matters of litigation. There is no suggestion that the draft of the contract of November 6th is an unfair exposition of the meaning of that of July 16th.

The petition charges that on August 6, 1906, that is, six days after the special meeting of the directors of July 31, 1906, at which the contract in question was approved and authorized to be executed, there was a regular meeting of the board of directors held, at which a resolution was adopted disapproving that contract and forbidding the officers to execute it unless a majority of the stockholders at a duly called meeting should approve it. It is alleged that that meeting was composed of three directors who constituted a majority of the board, to-wit, the director who had voted against the proposition to approve the contract at the meeting of July 31, 1906, and the director who had voted in favor of it at the meeting but who afterwards notified Mr. Allen, the president, that he had changed his mind; the resolution of disapproval is alleged to have been adopted by the vote of those two directors who constituted a majority of those present; the other director who is alleged to have been present, Mr. Allen, did not vote. The legality of that meeting is denied by the defendants; we will return to it herein later. The business of the Express Company was conducted under the new contract until the collapse of the company after this suit was instituted.

The Express Company failed to pay the Suburban

Company on January 15, 1907, the amount due for cars furnished and the service rendered in the preceding month of December, as required by the original contract of August 16, 1904, and also in the new contract of July 18, 1906, and the Suburban Company on January 16th notified the Express Company that the contracts existing between the two companies were, because of such failure, forfeited, and thereafter the Suburban Company refused to furnish cars to the Express Company and its business practically ceased. On January 19, 1907, on motion of the plaintiffs herein, the court appointed receivers to take possession of the property and affairs of the Express Company and conduct its business and authorized them to borrow $5000 to be used in the conduct of the business and issue certificates therefor. The plaintiffs loaned that amount of money to the receivers, taking receivers' certificates therefor; the receivers were ordered by the court to pay the Suburban Company $1400, the amount due it for the month of December and for the non-payment of which the forfeiture had been declared. The receivers made the payment and the court ordered the Suburban Company to continue furnishing cars and service to the Express Company as required under the contract of August 16, 1904, until the further order of the court. The business of the Express Company was conducted by the receivers until the final judgment in the cause, when they were discharged.

The petition states that defendant Allen was a stockholder in the Suburban Company and others of the defendants were also interested in that company, and were moved in their conduct in this matter by a desire to promote the interest of the Suburban Company at the expense of the Express Company.

The answers of all the defendants are in effect general denials, except that of the Suburban Company, which in addition to the general denial states,

as by cross-bill, the failure of the Express Company to perform its part of the contract in the particular of paying for the service rendered and that in consequence thereof the Suburban Company had declared the contract forfeited, having first given notice in writing to the Express Company on December 19th that it would do so unless the payment was made on January 15th in compliance with the contract. The cross-bill prayed that the court decree the contract forfeited.

To this the plaintiffs replied that the Suburban Company had no right to declare the forfeiture when it did so, because it had never demanded strict compliance with that part of the contract as to prompt payments, but the custom had been to let the payment be made within a reasonable time after the 15th of each month, and that custom had been a practical waiver of the strict letter of the contract; the reply also stated that the alleged notice that payment would be required on January 15th was not given to the plaintiffs or the other stockholders, but to Mr. Allen, the president.

The finding of the court was in favor of the defendants on the charges of fraud made against them and on all the issues. The decree was that the order of the court requiring the defendant the Suburban Company to furnish cars to the Express Company be dissolved, and that the plaintiff's bill be dismissed. It was also ordered that the receivers should make a report to the court showing the amount of money in their hands, that out of such fund they pay the expenses of the receivership and apply the balance towards payment of the certificates issued by order of court, and turn over all the rest of the property in their hands to the defendant the Electric Railway Express Company.

From that decree the plaintiffs have prosecuted this appeal.

. I.  There was a great deal of evidence in the case; it covers about 700 printed pages.  A very large part of it bears on the question of whether the contract of July 18, 1906, was so unfavorable to the Express Company as to sustain the charges in the petition that it was the result of fraud on the part of the individual defendants who were entrusted as directors with the duty of protecting the interests of that company.  If the contract of July 18, 1906, which modified that of August 16, 1904, was made in good faith and by lawful authority it cannot be set aside by the court on a showing that it was unwise or that it gave the Suburban Company the advantage.  Corporations like individuals sometimes make bad bargains, but the courts will not for that reason set their contracts aside.  We do not mean to say or imply that this was a bad bargain for the Express Company, but we merely state the point of law.

On the part of the plaintiffs there was evidence tending to show that, depriving the Express Company of the exclusive feature of the contract of August 16, 1904, and authorizing the Suburban Company to make a contract with the Illinois Traction Company, allowing it to run express cars carrying through freight over the Suburban road from Edwardsville to East St. Louis, introduced a competitor in the business destructive of the rights of the Express Company.  On the other hand the testimony on the part of the defendants tended to show that the Illinois Traction Company was a corporation owning a large system of already completed interurban electric railroads coming from Springfield, Illinois, towards St. Louis, and was then engaged in the construction of a line which when completed would reach from Edwardsville to East St. Louis, and that it had ample means to complete the line and when completed it could carry not only through but local express freight between those points.  But the Traction Company wanted to

cover the route along the contemplated line and enter East St. Louis with through-express freight without building that line and to devote its energies to the construction of its line into the city of St. Louis over its own bridge north of East St. Louis, and this was its inducement to seek a passage for its through East St. Louis freight over the Suburban road. If the Traction Company had been forced to complete its own line into East St. Louis it could have carried not only through-express freight, but local also from Edwardsville to East St. Louis, and it would have been a more formidable competitor of the Express Company than it would be if the concession to carry only through freight over the Suburban road was made. And if the Traction Company should complete its line into East St. Louis it would become a rival of the Suburban Company in carrying passengers into East St. Louis.

Upon those grounds it was said by witnesses for the defendants that it was to the interest of the three interested parties, the Express Company, the Suburban Company and the Traction Company, that the contract of July 18, 1906, should be made. The evidence for the defendants also tended to show that by this contract of July 18th the Express Company acquired the right to run express cars between East St. Louis and Alton, and East St. Louis and Edwardsville. The Express Company claims that it had the right before the contract of July 18th was entered into, but the evidence shows that the claim was disputed and the Express Company had not been able to exercise it. There were other features of less importance in the contract of July 18th that, according to defendant's testimony, were of advantage to the Express Company.

The testimony as to the conditions that confronted the Express Company was undisputed and it shows that the charge of fraud against the defendants was unfounded. There being no fraud in the conduct

of the directors, if they acted within the scope of their lawful authority, their act was lawful.

Let us now see by what authority they acted in making this contract.

, a. It is contended that the board of directors had no authority to make a contract to modify the contract of August 16, 1904, but that it could only be done by the stockholders.

The proposition is that the exclusive feature of the contract of August 16, 1904, constituted fully ninety per cent of the assets of the company and therefore represented ninety per cent of the capital stock, and when that feature is eliminated from the contract it reduces the capital stock of the corporation ninety per cent, and authorities are cited to show that a board of directors cannot increase or reduce the capital stock of a corporation. The proposition of law that a board of directors cannot increase or reduce the capital stock of the corporation is correct, but it is not applicable to the action of this board of directors in authorizing the making of the contract in question. This contract does not reduce the capital stock of this company, although it may affect the value of its shares, as any business contract may. It is also true that the "directors of a corporation cannot, unless thereto authorized by the shareholders, put an end to its business and defeat the objects of its creation by selling out *en masse* all its property and goodwill." [10 Cyc. 764.] But this contract had no such purpose or effect; if the managers of the company had been left alone to carry on its business under the new contract there is nothing in the record to show but that it might have entered on a more successful business career with the extended field of operation afforded by the new contract than it had theretofore enjoyed. But when these plaintiffs instituted this suit (which was before the Suburban Company had declared the contract forfeited), with their charges of

fraud, their prayers for injunction and for receivers, it was enough to destroy the credit of the company and to destroy that confidence in its management that had theretofore existed, and to induce the officers 'of the Suburban Company to declare the contract for, feited and .decline to do any more business with the Express Company.

When the suit was filed one of the city newspapers, as the evidence shows, gave it a conspicuous notice, with head lines directing attention to the alleged fraudulent conspiracy of the officers of the Express Company with the officers of the Suburban Company. A publication of that kind is likely to arouse resentment on the part of the men whose integrity is assailed. In his letter to the president of the Express Company, who had written a conciliatory letter to . him, the vice-president of the Suburban Company, giving as one of the reasons for insisting on prompt payment of the amount due, made reference to the "recent receivership proceedings and other public statements affecting the credit of your company."

Of course the company might.have gone to the wall when trying to do business under the new contract even if there had been no suit, no one knows what might have been, but the fact is, as plaintiffs themselves say, that up to that time the Suburban Company had not insisted on prompt payment for the service rendered, but had indulged the Express Company reasonable time in which to make its payments after the same became due according to the contract, but within four days after the institution of this suit the Suburban Company served notice on the Express Company that thereafter prompt payment would be required, and unless made on the 15th of January, 1907, the contract would be declared forfeited, as the contract itself authorized; on January 16th the Suburban Company did declare the contract forfeited and

refused to furnish cars to the Express Company; then the receivers were appointed.

Whilst it is the law that the directors of a corporation have no authority to put an end to its life, yet if this corporation came to its death in consequence of the action of the Suburban Company in declaring the contract forfeited and refusing to furnish cars to carry on the business of the Express Company, who is to blame?

"The directors are merely the managers of the property and business of the corporation, and cannot therefore perform constituent acts, by which expression is meant acts which involve fundamental changes in the constitution of the corporation." [10 Cyc., p. 762.] But they are the managers of its business, and have authority to make contracts binding the corporation in the conduct of its business, and the contracts they make cannot be set aside at the suit of stockholders on the ground that they do not promote the best interest of the corporation.

We hold that the contract of July 18, 1906 (which includes also the construing contract of November 6, 1906), was within the legitimate scope of the powers of the board of directors in this case.

b.   The meeting of the directors July 31, 1906, at which the contract in question was approved and the officers were authorized to execute it, was a special meeting and the objection which the plaintiffs take to its action is on the ground that the notice of the meeting did not specify the purpose of the call; but that is a mistake. The notice was: "This is to notify you that there will be a special meeting of the board of directors of the Electric Railway Express Company at this office at ten o'clock a. m. on Tuesday, July 31, 1906, for the purpose of then and there authorizing the president of this company to sign and enter into a certain contract with the East St. Louis and Suburban Railway Company bearing date July 16, 1906. And

for the further purpose of electing a director to fill the vacancy caused by the resignation of Martin J. Baker.'' At that date the draft of the contract submitted to the board bore the date July 16th, but it was redrafted before signing and dated July 18th. There was no material difference in the two drafts, in so far as concerns the plaintiffs' complaint. All the directors, four in number, attended that meeting and no objection was made to the notice; the contract was discussed and all of them voted on it. It is the same contract as that referred to throughout the record as the contract of July 18, 1906. The director who voted against making the contract vigorously opposed its adoption. ''Clause by clause [he testified] I took up the contract and offered objections to it. Mr. Allen undertook to answer the objections which I raised.'' The objector then requested that the matter be laid over and he be given further time to examine it, but that was refused, because they said the manager of the Suburban Company was going away for the summer and action must be taken then. The proposition was put to a vote and carried three yeas and one no. We discover no illegality in the proceedings of that meeting.

c.   The plaintiffs claim that there was a meeting of the board of directors on August 6, 1906, at which it was resolved that the contract bearing date July 16, 1906, which was presented ''at a special meeting of the board of directors July 31, 1906, be disapproved, and the officers of this company be and are hereby forbidden to execute and deliver said contract unless the majority of the stockholders at a duly called meeting shall approve the same.''

By the laws of the company it is provided: ''Regular meetings of the board of directors shall be held at the office of the company on the first Monday of every month at ten o'clock a. m.'' On August 6, 1906, which was the first Monday in that month, at ten

o'clock a. m., two directors came to the office of Mr. Allen, which was the office of the company. Those two directors were the director who had opposed the execution of the contract at the special meeting July 31, and the director who had voted in favor of its execution but who two days thereafter notified the president of the Express Company and also the vice-president of the Suburban Company that he had been deceived into voting for it and was then opposed to the contract. Mr. Allen being in the office when they came in, there were three directors present. The two brought the resolution already written with them to the office. According to the testimony of the director who had voted no at the meeting July 31st, when the two entered the office he told Mr. Allen that they had come to hold a directors' meeting; that Mr. Allen said: "I recognize a quorum is present and I will have to put any motion you make;" but when the motion to disapprove the contract was made, Mr. Allen charged them with sharp practice and with trying to take advantage of him in the absence of the other director; "he started to leave the office, but did not get away until the motion was put and passed; that is, he did not get out of the room, he tried to." The secretary of the company being absent this director acted as secretary. The board had not been holding regular meetings on the day mentioned in the by-laws; it held a regular meeting in October, 1905, and one in February, 1906, not since.

The other one of these two directors was also a witness for plaintiffs on this point. He testified that he went there at the request of his companion. "Well, he said we would go down and pass these two motions. Q. He said if you went down Mr. Allen would be the only other director there and you could carry anything you wanted, didn't he? A. He didn't say that, but I guess he meant that. Q. And you knew that when you went down there neither Dr. Starkel nor Mr.

Weingaertner would be there? A. I knew it, yes, sir. Q. You knew that when you went in there and began negotiations, tried to have a meeting, that it was a fake meeting, didn't you? A. I don't know whether you would call it a fake meeting. Q. Well, I am not asking you what I would call it, but you knew that it was a fake meeting, didn't you? A. I am not familiar enough to know what a fake meeting is. I knew it was not a regular meeting that we had there. Q. You knew that it was not a *bona fide* meeting? A. I don't know how to answer that either. Q. Do you know what that word means? You knew the meeting was not a fair one to all the directors. A. Yes, sir. Q. You knew that Mr. Weingaertner and Dr. Starkel, if they were present, would not vote with you and Mr. Young? A. Yes, sir. Q. You made no effort to apprise them in any way that you were going to take this exceptional course and try to have a meeting on that day, did you? A. No." That director testified that soon after that meeting he resigned. "Q. Why did you resign? A. Why, I got thoroughly disgusted with the wrangle."

Mr. Allen's testimony was to the effect that when these two gentlemen came to his office he did not understand that they came to hold a directors' meeting, they talked in a conversational way about the contract, then one of them made a motion and the other seconded it; then Mr. Allen understood for the first time that they were trying to hold a meeting, he went to the telephone and communicated with his attorney and after getting his advice left the room. He denied that he said that he recognized that there was a quorum present, and would have to put any motion they made.

There is no legal process by which a director of a private business corporation can be forced to attend a meeting, and he cannot lawfully be compelled by physical force to attend, nor can he be trapped into an attendance against his will. It happened to be the

fact that Mr. Allen's office was the office of the company and he was there for his daily work, not expecting a meeting of the board. These gentlemen knew that they would find him there, knew the other directors would not be there and they planned to force a meeting at which they would constitute a majority. We hold that that was not a lawful meeting of the board of directors.

d. At a special meeting of the board on November 8, 1906, the minutes of the meeting of July 31st, approving the contract in question, were adopted.

At a meeting held November 27th the director who had voted no at the meeting of July 31st, offered a resolution to the effect that the company employ counsel to bring suit to set aside the contract of July 18th, and the contracts of subsequent dates, on the ground that they were entered into without authority and were void. The resolution was lost by a vote of three to two, the two being the two who attempted to hold a meeting on August 6th. Then the same director offered a resolution of like effect with the addition that the officers of the company had fraudulently conspired with the Suburban Company and others to enter into the contracts in violation of the rights of the stockholders of the company. Another director then moved to adjourn, stating as a reason therefor that he declined to sit in a meeting with a member who would offer such an insulting resolution; the motion was carried by a vote of three to two.

On December 15, 1906, a stockholders' meeting was held, at which a resolution was offered ratifying and approving the action of the officers in executing the contract of July 18th and November 6, 1906. Thereupon canvassers were appointed to collect the votes of the stockholders on the resolution and report at the regular annual meeting of the stockholders January 8, 1907. At that regular meeting the canvassers appointed reported, showing that there were 600

shares voted in favor of the resolution and 320 against it, and thereupon it was announced that the resolution was adopted and it was so entered on the record.

At the stockholders' meeting January 8, 1907, Mr. Allen stated that the Suburban Company had given notice that unless the car rental was paid on the 15th the contract would be declared cancelled, and he urged that action be taken to raise the money. After a full discussion the matter was referred to a meeting of the board of directors to be held on the 15th inst. That meeting was held and various ways and means were discussed, but the money was not raised. Mr. Allen offered to indorse the note of the company for the amount required, provided the director who had op-posed the execution of the contract of July 18th would join him in the indorsement, but that director refused to do so, saying that plenty of money could be raised if the contract of July 18 and November 6, 1906, were cancelled, and the old contract of August 16, 1904, restored.

The evidence amply sustains the chancellor's findings of the facts and justifies the decree discharging the receivers and dismissing the plaintiff's bill.

II. By the decree in this case the contracts between the Express Company and the Suburban Company, under which the latter was to furnish to the former express cars to be carried over its road, are declared to be "canceled, forfeited and of no effect." On this the appellants make the point that a court of equity has not jurisdiction to declare a forfeiture. It is true the question of forfeiture is one to be dealt with by courts of law. A court of equity never interferes with the subject unless to prevent a forfeiture when conditions are such as to render it inequitable to allow it to be enforced. But that clause may be stricken out of this decree without changing its effect. The fact is, that part of the answer of the Suburban Com-

pany which undertakes to set up as if by cross-bill the facts justifying the action of that company in declaring the forfeiture, and praying the court to decree the contracts forfeited, was unnecessary and bad pleading. The plaintiff's petition stated that the Suburban Company had declared the contract forfeited and had refused to further perform its part, and then the petition went on to make statements showing why it would be inequitable to permit the forfeiture, and prayed that it be annulled and that the Suburban Company be required to continue its service. The general denial of the Suburban Company put in issue those statements and the court found that the evidence did not sustain the plaintiff's statements and dismissed their bill. That disposed of the question of the forfeiture as completely as if there had been no cross-bill or as if it had been ignored. The forfeiture having been declared by the defendant company, the plaintiffs having prayed the court to set it aside, and the court having refused in its final decree to do so left the forfeiture standing and that was the end of the subject. The plaintiffs were not prejudiced by the decree declaring the contracts forfeited, although the decree would have been in better form if that clause had been omitted.

III. On June 17, 1907, the court rendered the final decree, finding all the issues in favor of the defendants and dismissing the plaintiffs' bill; in the decree was the following: "And it is further ordered that said receivers pay out of the funds in their hands such other expenses and obligations incurred by such receivers in the management and conduct of the business of said Electric Railway Express Company that are unpaid. And it is further ordered that any balance that may be in their hands shall be applied to the payment of the receivers' certificates heretofore issued

241 Sup.—7

by this court, pursuant to the order of court made on January 19, 1907, and that all other property shall be turned over to the defendant Electric Railway Express Company.'' On June 20, 1907, plaintiffs filed a motion for a new trial, which was by the court overruled October 7, 1907, and plaintiffs excepted. Appellants in their brief now say that there was at that time outstanding certificates issued by the receivers to the amount of $4000, for money advanced them by plaintiffs, and that it was error in the court to order the property of the Express Company returned to it instead of having the property sold by the receivers and the proceeds applied to the payment of the certificates. They say in their brief that this property, which consisted in the main of horses and wagons, was, after it was returned to the Express Company, sold by the president of the company for $4200, and he should now be required to pay those certificates out of that fund.

Without passing on the question of whether, under the facts of this case, the plaintiffs would have been entitled to have the personal property of the Express Company sold to reimburse them for the money they claim to have advanced, it is sufficient to say there is no such question now before us. In their motions for a new trial they did not assign that the court had erred in ordering the property turned back to the Express Company and there is no general assignment in the motion that covers the point. The motion for new trial was filed June 20, 1907, overruled October 7, 1907, appeal prayed and granted November 12, 1907, but it was not until January 31, 1908, that the plaintiffs filed a motion in the court asking that the order discharging the receivers be set aside and that the Express Company and its president be ordered to turn over to the receivers the proceeds of the sale of the property; that was several months after the final judgment had been rendered and more than two months after this appeal had been taken.

None of that matter is embraced in the bill of exceptions, and could not have been, because it did not occur during the proceedings covered by the bill of exceptions; it is all printed in the abstract, but is outside of the bill of exceptions. The bill of exceptions covers the proceedings at the October, 1907, term, this matter occurred at a subsequent term, and there is no bill of exceptions covering it; its insertion in the abstract is unauthorized.

A final decree determines the rights of the parties on all the points in issue; when there is a receiver in the case it is proper that in the final decree he should be directed to make disposition of funds and property in his hands and report subsequently what he has done in obedience to the decree. If his report filed at a subsequent term shows that he has acted contrary to the decree parties have a right then to except to his action, but if he has acted in accordance with the decree the party deeming himself aggrieved can be heard in an appellate court only on appeal from the decree. In this case the final report of the receivers was made at a subsequent term, but that report is not in this bill of exceptions, therefore we cannot take notice of it; there is no bill of exceptions covering that term, therefore we do not know what evidence if any was before the court; we do not know that there were at that time outstanding certificates or for what amount or who owned them; we have statements on those points in what purports to be the motion of plaintiffs filed at that subsequent term, but even that motion is not authenticated by a bill of exceptions, and is not a legitimate part of this record. Appellants in their brief say that when the motion was overruled they excepted, but the record does not so show.

If appellants should now take the position that there was no final decree until the order of the court approving the final report of the receivers and discharging them (which position would not be tenable)

State ex rel. v. Blake.

they would on that theory be out of court entirely, because this appeal is from the decree rendered June 17, 1907; if that is not a final decree then this appeal is premature.

We find no error in the record. The judgment is affirmed.